Deutsche Bank Trust Co. Ams. v. TradeWinds Airlines, Inc., 2009 NCBC 12.

NORTH CAROLINA

COUNTY OF GUILFORD

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
03 CVS 12215

DEUTSCHE BANK TRUST
COMPANY AMERICAS,

Plaintiff

v.

TRADEWINDS AIRLINES, INC.,
TRADEWINDS HOLDINGS, INC.
COREOLIS HOLDINGS, INC., DAVID
ROBB, RICHARD RESSLER, JEFF
CONRY, GEORGE
MCCONNAUGHEY,
DAVID JOHNSON, JOHN and JANE
DOES NO. 1–50,

Defendants

v.

P-G NEWCO LLC, S-C NEWCO LLC,
C-S AVIATION SERVICES, WELLS
FARGO BANK NORTHWEST, NA and
DOES No. 1–20,

Third-Party Defendants

ORDER & OPINION

{1}  THIS MATTER is before the Court on Third-Party Defendant C-S Aviation Services, Inc.'s ("C-S Aviation") Motion to Set Aside Entry of Default and Default Judgment (the "Motion to Set Aside").  The Entry of Default and Default Judgment were entered in favor of Defendant and Third-Party Plaintiff TradeWinds Airlines, Inc. ("TradeWinds").  Also currently pending are Coreolis Holdings, Inc.'s ("Coreolis") and TradeWinds Holdings, Inc.'s ("Holdings") Motion for Default Judgment.

{2}     Like aircraft lined up for departure, the litigation involving TradeWinds is stacked up on the taxiway awaiting clearance for takeoff.  First in line is the bankruptcy case in Florida.  Chief Judge Emeritus A. Jay Cristol of the United States Bankruptcy Court for the Southern District of Florida Miami Division is piloting that flight, and until he lifts the stay of litigation in bankruptcy, the cases in line behind him will not be cleared for takeoff.  Second in line is the North Carolina litigation.  It cannot proceed until the stay is lifted.  This Order provides some guidance to the other courts of the likely flight plan for the North Carolina case once the stay is lifted.  Last in line is the plane from New York.  United States District Court Judge John F. Keenan has entered an order staying that litigation until the North Carolina courts can rule on the Motion to Set Aside the original Default Judgment.  Judge Keenan cannot determine what North Carolina judgment to enforce until it is a final judgment.[1]

{3}     TradeWinds filed for Chapter 11 bankruptcy protection in the Southern District of Florida on June 25, 2008.  TradeWinds' bankruptcy estate is currently involved in litigation under Chapter 7 of the United States Bankruptcy Code.  On February 10, 2008, Judge Cristol issued a Memorandum Decision granting the motion of the Chapter 7 Trustee for TradeWinds' bankruptcy estate to enforce an automatic stay against fellow Defendants and Third-Party Plaintiffs Coreolis and Holdings.  *See In re TradeWinds Airlines, Inc.*, No. 08-20394-BKC-AJC, slip op. at 3 (Bankr. S.D.Fla. Feb. 10, 2009).  Coreolis and Holdings filed a joint Motion to Amend the Default Judgment in this Court.  The bankruptcy court stated that the "[Default] Judgment is property of the [TradeWinds] estate and any action taken with respect to that Judgment, whether to correct an error or to vacate the Judgment completely, is an act in violation of the stay."  *Id.* at 6.

---

[1] *See TradeWinds Airlines, Inc. v. Soros*, 08 Civ. 5901 (S.D.N.Y. Feb. 23, 2009).  The New York case seeks to pierce C-S Aviation's corporate veil and to enforce the North Carolina judgment against its owners, George Soros and Purnendu Chatterjee, two wealthy individuals.  The Court notes here that it was not made aware of TradeWinds' intent to seek recovery of the Default Judgment against the individual owners of C-S Aviation at the time the motion was heard, nor was it made aware of the divergence of interest among TradeWinds, Coreolis, and Holdings.  Furthermore, the Court was not made aware of TradeWinds' intention to file for bankruptcy after the Default Judgment was entered or that it planned to sue George Soros, et al. to pierce C-S Aviation's corporate veil.

{4}     Because the stay issued by the bankruptcy court precludes action from this Court at this time, this Court declines to enter any order on C-S Aviation's Motion to Set Aside the Default Judgment.  The Court further stays all pending motions until the stay order is lifted by Judge Cristol.  Under North Carolina Rule of Civil Procedure 60(b)(6), however, it is likely that extraordinary circumstances exist that would require setting aside the Default Judgment so that the damages of TradeWinds, Coreolis, and Holdings might be litigated.  Additionally, C-S Aviation may have valid defenses to the damages awarded against it.

*Tuggle Duggins & Meschan, P.A. by J. Nathan Duggins, III and Emma C. Merritt for Defendant and Third-Party Plaintiff TradeWinds Airlines, Inc.*

*Ellis & Winters LLP by Paul K. Sun, Jr., Rebecca M. Rich, and Curtis J. Shipley for Third-Party Defendant C-S Aviation Services, Inc.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{5}     This action was filed in Guilford County on November 14, 2003.  Pursuant to Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts, the case was designated complex business and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina on January 15, 2004.

{6}     In January 2004, Defendants and Third-Party Plaintiffs TradeWinds, Coreolis, and Holdings (collectively "the TradeWinds Group") filed a third-party complaint against Third-Party Defendants P-G Newco LLC, S-C Newco LLC, C-S Aviation, Wells Fargo Bank Northwest, N.A., and Does No. 1–20.  The claims against C-S Aviation were for fraudulent inducement, breach of contract, and unfair and deceptive trade practices.

{7}     On August 2, 2004, the TradeWinds Group filed a motion, pursuant to Rule 55(a) of the North Carolina Rules of Civil Procedure, for Entry of Default

against C-S Aviation.  Because C-S Aviation failed to file an Answer or otherwise respond to the Third-Party Complaint, the Court entered a Default against the company on August 19, 2004.  At that time, the TradeWinds Group was represented by Larry B. Sitton, Robert R. Marcus, and Heather Howell Wright, of Smith Moore Leatherwood LLP.

{8}     Following a settlement agreement between the original Plaintiffs and Defendants, the Court ordered the dismissal of all claims in this dispute, except Plaintiff Deutsche Bank's claims against Defendant David Robb and the TradeWinds Group's third-party claims against C-S Aviation.  On December 22, 2006, the Court dismissed the remaining Deutsche Bank claims.

{9}     On April 17, 2007, the Court closed its file in this matter.

{10}    In the spring of 2008, TradeWinds became aware of the possibility of piercing C-S Aviation's corporate veil to reach the company's owners.

{11}    On April 14, 2008, TradeWinds, acting alone and with new counsel, filed a Motion for Default Judgment against C-S Aviation.  In support of its motion, TradeWinds provided the affidavit of Jeffrey Conry, Chief Executive Officer and President of TradeWinds since 2000.

{12}    The Court held a hearing on the Motion for Default Judgment on June 19, 2008, and C-S Aviation did not appear to challenge it.  On June 27, 2008, the Court granted the Default Judgment, finding that C-S Aviation breached its leases with TradeWinds and that its conduct constituted unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes.  The Court awarded TradeWinds $16,326,528.94 as a direct result C-S Aviation's breach.  Adding treble damages and prejudgment interest, the Court ruled that TradeWinds was entitled to recover $54,867,872.49 from C-S Aviation.

{13}    The next business day, on June 20, 2008, TradeWinds filed an action in the United States District Court for the Southern District of New York (*TradeWinds Airlines, Inc. v. Soros,* No. 08 Civ. 5901 (S.D.N.Y)) (the "Soros suit") seeking to recover the Default Judgment by piercing C-S Aviation's corporate veil.

{14}   On July 25, 2008, TradeWinds filed a voluntary petition in the United States Bankruptcy Court in the Southern District of Florida seeking relief under Chapter 11 of the Bankruptcy Code.  The case was converted to a Chapter 7 proceeding by Order dated October 29, 2008.[2]

{15}   On July 31, 2008, the Court again closed its file in this matter without knowledge of the Soros suit or the bankruptcy.

{16}   Then, on August 27, 2008, C-S Aviation filed a Motion to Set Aside Entry of Default and Default Judgment under Rules 55(d) and 60(b)(1), (3), (4), (5), and (6) of the North Carolina Rules of Civil Procedure.

{17}   On November 13, 2008, Coreolis and Holdings filed a Motion to Revise the Default Judgment so that they could be added as beneficiaries of the judgment.  The Court heard oral arguments on both the Motion to Set Aside the Entry of Default and Default Judgment and the Motion to Revise the Default Judgment on January 27, 2009.

{18}   On February 10, 2009, the United States Bankruptcy Court for the Southern District of Florida issued a stay of litigation against Coreolis and Holdings to prevent the former parent companies of TradeWinds from altering the Default Judgment issued by this Court.

{19}   Pursuant to that court's ruling, Coreolis and Holdings withdrew their Motion to Revise the Default Judgment.

{20}   Coreolis and Holdings filed their own Motion for Default Judgment on March 6, 2009.

---

[2] At the time of the bankruptcy, TradeWinds was owned by Watkins Aviation, LLC; ASI Advisors, LLC; General Retirement System of the City of Detroit; Police and Fire Retirement System of the City of Detroit; Jeffrey G. Conry; and George McConnaughey.  Watkins Aviation, LLC, ASI Advisors LLC, Jeffrey G. Conry, and George McConnaughey pledged their stock to the Police and Fire Retirement System of the City of Detroit, as administrative agent, as collateral for a loan made to TradeWinds.

## II.

## FACTUAL BACKGROUND

### A.

### THE PARTIES

{21} Defendant and Third-Party Plaintiff TradeWinds is a certified air-freight carrier organized under the laws of Delaware, having its principal place of business in Greensboro, North Carolina. (Am. Answer, Countercl., and Third-Party Compl. ("Third-Party Compl.") ¶ 5.) TradeWinds is currently involved in a Chapter 7 bankruptcy proceeding in the Southern District of Florida. *See In re TradeWinds Airlines, Inc.*, No. 08-20394-BKC-AJC (Bankr. S.D.Fla.).

{22} Defendant and Third-Party Plaintiff Holdings is a corporation organized under the laws of Delaware, having its principal place of business in Greensboro, North Carolina. (Third-Party Compl. ¶ 6.) When this litigation began, Holdings was the sole shareholder of TradeWinds. (TradeWinds' Notice of Filing, Ex. A, Mar. 6, 2009.) On April 29, 2005, Holdings pledged all TradeWinds' stock to Wells Fargo. (TradeWinds' Notice of Filing, Ex. A, Mar. 6, 2009.) On November 1, 2006, after TradeWinds defaulted on its loan, Wells Fargo foreclosed on TradeWinds' stock. (TradeWinds' Notice of Filing, Ex. A, Mar. 6, 2009.)

{23} Defendant and Third-Party Plaintiff Coreolis is a corporation organized under the laws of Delaware, having its principal place of business in Los Angeles, California. (Third-Party Compl. ¶ 7.)

{24} Third-Party Defendant C-S Aviation is a corporation organized under the laws of Delaware. (Third-Party Compl. ¶ 9.) C-S Aviation was "Lessor's Aircraft Manager." (Third-Party Def. C-S Aviation Services, Inc.'s Br. Supp. Mot. Set Aside Entry Default & Default J. ("Br. Supp. Mot. Set Aside") 5.)

### B.

### SERVICE OF PROCESS

{25} After TradeWinds filed its Third-Party Complaint against C-S Aviation, it attempted to serve the company at its former business address. (Br. Supp. Mot. Set Aside 8.) Unsuccessful there, TradeWinds sent copies of its summons and

Third-Party Complaint to C-S Aviation's registered agent, the Corporation Trust Company ("CT Corporation"), via certified mail, return receipt requested. (Def. & Third-Party Pl. TradeWinds' Br. Resp. Mot. Set Aside Entry Default & Default J. ("Br. Resp. Mot. Set Aside") 5; Br. Supp. Mot. Set Aside 8–9.) The CT Corporation received the documents by certified mail on March 22, 2004. (Br. Supp. Mot. Set Aside 9.)

{26} C-S Aviation acknowledged that it had actual notice of TradeWinds' complaint. (*See* Tr. of Hr'g 7, *Deutsche Bank Trust Co. Americas v. TradeWinds Airlines, Inc.*, No. 03 CVS 12215 (argued January 27, 2009).) Though CT Corporation sent the service papers to Wind Sheer, a company formed after the bank foreclosure to manage the aircraft leases, C-S Aviation had actual knowledge of the suit. (*See* Tr. of Hr'g 7, *Deutsche Bank*, No. 03 CVS 12215 (argued January 27, 2009).) The employees of the newly formed Wind Sheer were the same employees that managed C-S Aviation. (*See* Tr. of Hr'g 7, *Deutsche Bank*, No. 03 CVS 12215 (argued January 27, 2009).) "Certainly, those employees knew what was going on. They were being deposed." (Tr. of Hr'g 7, *Deutsche Bank*, No. 03 CVS 12215 (argued January 27, 2009).) Those employees chose to ignore the claim. CT Corporation did not send the suit papers to C-S Aviation.

{27} TradeWinds elected to pursue a Default Judgment once another plaintiff in a suit against C-S Aviation succeeded in piercing the corporate veil in federal district court for the Southern District of New York. (Br. Resp. Mot. Set Aside 5, 7.) C-S Aviation appears now before this Court to challenge the Default Judgment entered against it.

III.

THE MOTION

{28} C-S Aviation filed its Motion to Set Aside on August 26, 2008. It states there is "good cause" to set aside the entry of default and "multiple reasons" to set aside the default judgment. (Br. Supp. Mot. Set Aside 3.) First, C-S Aviation claims the Court lacked personal jurisdiction over it because TradeWinds did not

properly serve it with the summons and Third-Party Complaint and because it did not "present the required proof of service for entry of default and default judgment." (Br. Supp. Mot. Set Aside 3.)  Second, C-S Aviation claims the Third-Party Complaint did not state a claim on which relief can be granted.  (Br. Supp. Mot. Set Aside 3.)  Third, C-S Aviation submits that "[e]xtraordinary circumstances exist" and that "justice demands that the entry of default and default judgment be set aside." (Br. Supp. Mot. Set Aside 4.)

A.

LEGAL STANDARD

1.

RULE 55(d) MOTION TO SET ASIDE ENTRY OF DEFAULT

{29}   A court may set aside an entry of default for "good cause shown."  N.C. R. Civ. P. 55(d).  "What constitutes 'good cause' depends on the circumstances in a particular case . . . ." *Peebles v. Moore*, 48 N.C. App. 497, 504, 269 S.E.2d 694, 698 (1980).  A defaulting party has the burden of establishing this standard.  *See Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 37, 392 S.E.2d 663, 668 (1990).  The determination of whether a movant has demonstrated good cause "rests in the sound discretion of the trial judge."  *Byrd v. Mortenson*, 308 N.C. 536, 539, 302 S.E.2d 809, 812 (1983).

2.

RULE 60(b) MOTION TO SET ASIDE DEFAULT JUDGMENT

{30}   A court "may relieve a party . . . from a final judgment, order, or proceeding for . . . [a]ny . . . reason justifying relief from the operation of the judgment."  N.C. R. Civ. P. 60(b).  This rule "gives the court ample power to vacate judgments whenever such action is appropriate to accomplish justice."  *Brady v. Town of Chapel Hill*, 277 N.C. 720, 723, 178 S.E.2d 446, 448 (1971) (internal quotations omitted).  "A motion under Rule 60(b) is addressed to the sound discretion of the trial court . . . ."  *Harris v. Harris*, 307 N.C. 684, 687, 300 S.E.2d 369, 372 (1983).  The burden of proving grounds for relief is on the moving party. *See Elder v. Elder*, No. COA03-372, 2004 N.C. App. LEXIS 139, at *3 (Jan. 20,

2004) (Rule 60(b) motion); *Royal v. Hartle*, 145 N.C. 181, 182–85, 551 S.E2d 168, 170–72 (2001) (affirming the trial court's ruling that movants did not meet their burden of proof in a Rule 60(b)(4) and Rule 60(b)(6) motion); *Blankenship v. Price*, 27 N.C. App. 20, 23, 217 S.E.2d 709, 710 (1975).

B.

ANALYSIS

1.

MOTION TO SET ASIDE ENTRY OF DEFAULT

{31}   C-S Aviation must demonstrate "good cause" to set aside the Entry of Default.  N.C. R. Civ. P. 55(d).  It is true that the law "generally disfavors default and any doubt should be resolved in favor of setting aside an entry of default so that the case may be decided on its merits."  *Auto. Equip. Distrib., Inc. v. Petroleum Equip. & Serv., Inc.*, 87 N.C. App. 606, 608, 361 S.E.2d 895, 896 (1987) (internal quotations omitted).  However, adherence to rules that "require responsive pleadings within a limited time serve important social goals, and a party should not be permitted to flout them with impunity."  *Howell v. Haliburton*, 22 N.C. App. 40, 42, 205 S.E.2d 617, 619 (1974).

{32}   North Carolina appellate cases support the general principle that "a party served with a summons must give the matter the attention that a person of ordinary prudence would give to his important business."  *E. Carolina Oil Transp., Inc. v. Petroleum Fuel & Terminal Co.*, 82 N.C. App. 746, 748, 348 S.E.2d 165, 167 (1986).  In *Howell*, the North Carolina Court of Appeals upheld a trial court's denial of Defendant Pepsi-Cola Bottling Company of Winston Salem's motion to set aside an entry of default when it failed to answer the complaint.  *See* 22 N.C. App. at 42, 205 S.E.2d at 618.  An employee received the summons and complaint and sent them to the company's liability insurer.  *See id.*, 205 S.E.2d at 618.  Neither the bottler nor the bottler's insurance company took any action on the matter for over eight (8) months, and the bottling company responded only when it received notice that an entry of default had been entered against it.  *See id.*, 205 S.E.2d at 618–19.  Similarly, in *RC Assocs. v. Regency Ventures, Inc.*, the appellate court declined to

overturn a trial court's denial of a motion to set aside an entry of default when the officers of the corporate defendant did not respond to a complaint when they assumed their attorney had filed a response. *See* 111 N.C. App. 367, 375, 432 S.E.2d 394, 398–99 (1993). In *Grant v. Cox*, the appellate court also upheld a trial court's denial of a corporate defendant's motion to set aside an entry of default when the defendant apparently relied on a deputy sheriff's belief that a second summons granted additional time to respond to an earlier summons. *See* 106 N.C. App. 122, 124–26, 415 S.E.2d 378, 380–81 (1992).

{33} Here, unlike the defendants in the cases above, C-S Aviation could be more than merely negligent in its failure to respond to this Court's summons. Its failure to respond to the summons appears to be intentional. It may have relied on the belief that any judgment against it would be worthless. *Howell* confirms that a party "flout[ing] . . . with impunity" its obligation to respond to pleadings does not demonstrate the "good cause" required to convince a court to revisit its own default order. 22 N.C. App. at 42, 205 S.E.2d at 619. Additionally, C-S Aviation holds itself out to be a "sophisticated part[y]." (Tr. of Hr'g 29, *Deutsche Bank*, No. 03 CVS 12215 (argued January 27, 2009).) Sophisticated business persons who are parties to a lawsuit understand that they disregard a court summons at their peril.

{34} Despite this showing, C-S Aviation claims their Rule 55(d) motion should be granted in part because the Court never obtained personal jurisdiction over it. (Br. Supp. Mot. Set Aside 14–20.) First, C-S Aviation claims TradeWinds' service of process was improper because it failed to follow a provision of Delaware corporate law that requires *in-person* delivery of service for a Delaware corporation. (*See* Br. Supp. Mot. Set Aside 15–16 (*citing* Del. Code Ann., tit. 8, § 321).) Second, C-S Aviation claims the proof of service TradeWinds presented to the Court does not comport with the requirements of section 1-75.11 of the North Carolina General Statute because the certified mail receipt contained in the electronic record fails to prove that CT Corporation ever received the summons and Third-Party Complaint. (Br. Supp. Mot. Set Aside 16–18.) Finally, C-S Aviation claims that Jeff Conry's affidavit, which must allege minimum contacts necessary to establish personal

jurisdiction, lacks the necessary facts to do so.  (Third-Party Def. C-S Aviation Services Inc.'s Reply Br. Supp. Mot. Set Aside Entry Default & Default J. ("Reply Br.") 9–14.)

a.

SERVICE OF PROCESS LIKELY WAS PROPER

{35}   North Carolina allows service of process on a foreign corporation by "mailing a copy of the summons and of the complaint, registered or certified mail, return receipt requested, addressed to the officer, director or agent to be served." N.C. R. Civ. P. 4(j)(6)c.  A corporation's agent may be "authorized by appointment or by law to be served or to accept service of process."  N.C. R. Civ. P. 4(j)(6)b.  C-S Aviation admits that TradeWinds attempted service on its agent, CT Corporation, by certified mail, but it claims that service was not effective.  (Br. Supp. Mot. Set Aside 15.)  It asserts that under Delaware general corporate law, CT Corporation was not authorized to receive service by that method.  (Br. Supp. Mot. Set Aside 15–16; Reply Br. 4.)  Though C-S Aviation agrees that Rule 4 of the North Carolina Rules of Civil Procedure is procedural in nature, it argues that the rule "incorporates substantive agency law to define the existence and scope of an agent's authority to accept service" and that "[b]ecause C-S Aviation is a Delaware corporation, Delaware law defined the scope of CT Corporation's authority to act as C-S Aviation's agent in Delaware for service of process."  (Reply Br. 3.)  C-S Aviation argues that because TradeWinds did not follow Delaware law in its service of process, the service was improper.  (Br. Supp. Mot. Set Aside 15–16; Reply Br. 3.)  Conversely, TradeWinds argues that service of process is purely "a procedural, rather than a substantive issue," and that "North Carolina law governs this Court's consideration" of the service of process issue.  (Br. Resp. Mot. Set Aside 12.)

{36}   C-S Aviation's argument about improper service of process is unpersuasive.  "The local law of the forum determines the method of serving process and of giving notice of the proceeding to the defendant." *Restatement (Second) of Conflict of Laws* § 126 (1971).  Because in North Carolina the manner of service

shall be the same "within or without the State," service upon C-S Aviation will be proper only if it comports with North Carolina law. N.C. R. Civ. P. 4(j).

{37} Determining whether Rule 4 is procedural or substantive in nature is important because each category receives different treatment in the conflict of laws determination. *See Charnock v. Taylor*, 223 N.C. 360, 361, 26 S.E.2d 911, 913 (1943). The court in *Charnock* stated:

> As to substantive laws, or laws affecting the cause of action, the *lex loci*—or law of the jurisdiction in which the transaction occurred or circumstances arose on which the litigation is based—will govern; as to the law merely going to the remedy, or procedural in its nature, the *lex fori*—or law of the forum in which the remedy is sought—will control.

*Id.; see Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988) ("Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, . . . and . . . procedural rights are determined by lex fori . . . .").

{38} In order for C-S Aviation to succeed in its argument that Delaware substantive law applies to the service of process, it must persuade the Court that the substantial rights of the parties should be determined by Delaware law. C-S Aviation expressly stated, however, that "[t]he Lease Agreements make New York law the governing law." (Br. Supp. Mot. Set Aside 22 n.8.) Thus, New York law controls the substantial rights of the parties. Additionally, C-S Aviation cannot claim that the events leading to this suit took place in Delaware. The alleged harm took place in either North Carolina or in New York. It is possible to argue that the "transaction occurr[ing]" in Delaware was the service of process itself. *Charnock*, 223 N.C. at 361, 21 S.E.2d at 913. The Court, however, doubts the North Carolina Supreme Court intended the term "transaction" in *Charnock* to be that broad. Thus, even if Rule 4 did include a substantive component, the substantive component could not be Delaware law.

{39} The better view is that "Rule 4 is devoted solely to the form and manner of perfecting service of process and is only indirectly concerned with the legal complexities of personal and subject matter jurisdiction that may arise thereafter."

G. Gray Wilson, North Carolina Civil Procedure § 4-1(3d ed. 1995). The Court may look to Delaware substantive law to decide whether the party is properly qualified as an "agent" to receive service of process, but it is not bound by Delaware's restrictions on the manner in which service on a duly qualified agent must be conducted. *See, e.g.*, *A.M. Simon Co., Inc. v. William McWilliams Indus., Inc.*, 286 F. Supp. 564 (S.D.N.Y. 1968); *Breer v. Sears, Roebuck and Co.*, 709 N.Y.S.2d 798 (Sup. Ct., Bronx County 2000).

{40}   The United States District Court for the Southern District of New York faced a similar procedural question when it found Delaware corporate law to be in conflict with New York procedural law in *A.M. Simon Co.* McWilliams Industries, Inc. ("McWilliams") was a Delaware corporation with its principal place of business in Louisiana. *See* 286 F. Supp. at 565. The plaintiff filed suit in the Supreme Court in New York County,[3] but the case was removed to federal court under diversity of citizenship. *See id.* Service was attempted when a Delaware sheriff delivered a summons and a complaint to the Delaware Secretary of State. *See id.* This manner of service would have been proper in New York because "service may be made in New York upon a domestic or foreign corporation by serving an officer or 'any other agent authorized by appointment or by law to receive service,'" and the New York Secretary of State is an agent authorized by appointment and by law to receive service of process. *Id.* at 565–66 (*quoting* N.Y. C.P.L.R. § 311). "Every domestic corporation and every foreign corporation qualified to do business in New York must designate the Secretary as its agent for that purpose." *Id.* at 566.

{41}   Such service was, however, improper in Delaware. *See id.* at 565. Delaware general corporate law permits service on the Delaware Secretary of State "only when the process server cannot 'by due diligence' serve an officer or the registered agent." *Id.* (*quoting* Del. Code Ann. tit. 8 § 321(b)). McWilliams' registered agent, the Corporation Trust Company, was registered with the Delaware Secretary of State, but the sheriff did not exercise the due diligence required to locate it. *See id.* at 565–66.

---

[3] In New York, the "Supreme Court" is the trial court.

{42}     Even though section 302 of New York's Civil Practice Law and Rules "provides that service may be made without the state in the same manner as service is made within the state," the district court held that the service of process was improper *under New York law*. *Id.* at 565 (internal quotations omitted). Under these circumstances, the Delaware Secretary of State was never considered to be an "agent authorized by appointment or by law to receive service," which New York law requires. *See id.* at 566; N.Y. C.P.L.R. § 311(a)1. The court in *A.M. Simon Co.* continued:

> [I]f Delaware law did not authorize service of a summons upon the Secretary of State under any circumstances, the delivery of the summons to him in Delaware could not be a valid service of process issued out of a New York court. And the same principle applies here where the service is invalid under Delaware law, not because the Secretary of State can never be served under any circumstances, but because he can be served only under certain conditions which are not present in this case.

*A.M. Simon Co.,* 286 F. Supp. at 566 (internal citations omitted).

{43}     A New York state court faced a similar procedural question when a plaintiff served an Ohio corporation by sending the complaint to the Ohio Secretary of State in *Breer*. As in *A.M. Simon Co.*, the court determined that service outside the state "must be made in the foreign jurisdiction in a manner consistent with the manner of a service authorized under the laws of the State of New York." *Breer*, 709 N.Y.S.2d at 802. The *Breer* court agreed with the outcome of *A.M. Simon Co.*, but it was not persuaded by the federal court's reasoning. *See id.* at 805. In order to determine whether the service of process was consistent with New York law, the *Breer* court made two separate inquiries:

> First, whether the Secretary of State of Ohio was designated . . . as an agent for the service of process by actual designation, or by operation of Ohio law; and second, if the Ohio Secretary of State was a duly authorized agent, was the Ohio Secretary of State served in a manner consistent with New York law. Only after the first issue is resolved should the court examine the method of delivery which was actually employed to give notice to that agent.

*Id.* at 803. Because the court determined that the plaintiff did not establish "the necessary prerequisites triggering the appointment of the [Ohio] Secretary of State as an agent for the service of process," the Secretary of State never became an authorized agent to receive process. *Id.*

{44} C-S Aviation argues that the holding in *A.M. Simon Co.* supports its claim that "North Carolina's procedural service rules for its courts cannot expand the scope of an agent's authority under the substantive laws of the state where the agency exists." (Reply Br. 4.) It argues that because the federal district court determined that service of process was not proper under Delaware law, this Court should apply substantive Delaware law to determine the proper limitations on "CT Corporation's authority to accept service." (Reply Br. 5.)

{45} This argument overlooks the fact that the issue before the federal district court was whether the service of process was in keeping with *New York law* (specifically section 313 of New York's Civil Practice Law and Rules). *See A.M. Simon Co.*, 286 F. Supp at 565. The court did not state that the *manner* in which the plaintiff served the Secretary was improper, as C-S Aviation alleges here. *See id.* at 566. Rather, it determined that the Delaware Secretary of State could be considered an agent under section 311 of New York's Civil Practice Law and Rules only under "certain conditions." *Id.* Under the circumstances in the case, the Secretary of State was not considered an agent authorized by law or appointment to receive service in the first place. *See id.*

{46} Though the reasoning in *Breer* differs from that of *A.M. Simon Co.*, the distinction is without a real difference. In both cases, the issue was whether the service of process from a New York court comports with New York procedural law. *See id.*; *Breer*, 709 N.Y.S.2d at 803. The only substantive law the courts considered from the defendant corporations' home states was whether the respective Secretaries of State could qualify as an agent for receiving service of process. *See A.M. Simon Co.*, 286 F. Supp. At 566; *Breer*, 709 N.Y.S.2d at 803. Because neither qualified as an agent, neither could receive service under New York law. *See A.M Simon Co.*, 286 F. Supp. at 566; *Breer*, 184 Misc. 2d at 922, 709 N.Y.S.2d at 803.

{47}   Moreover, Delaware law allows service of process to be conducted on foreign corporations by mail, return receipt requested.  *See* Del. Code Ann. tit. 10 § 3104 (a), (d) ("When the law of this State authorizes service of process outside the State, the service, when reasonably calculated to give actual notice, may be made . . . [b]y any form of mail addressed to the person to be served and requiring a signed receipt.").  Because the Delaware legislature believes it prudent to allow Delaware litigants the opportunity to serve non-Delaware corporations in the same manner TradeWinds served C-S Aviation, the North Carolina courts will not likely close their doors to would-be litigants who served a Delaware corporation with the good faith belief that they acted in accordance with applicable law.

b.

PROOF OF SERVICE IS PROPER

{48}   TradeWinds' proof of service complies with North Carolina law.  "Where a defendant fails to appear in the action within apt time the court shall, before entering a judgment against such defendant, require proof of service of the summons in the manner required by G.S. 1-75.10."  N.C. Gen. Stat. § 1-75.11 (2007).  An affidavit of service by registered mail complies with the requirements of section 1-75.10, if it indicates:

> a. [t]hat a copy of the summons and complaint was deposited . . . for mailing by registered . . . mail, return receipt requested; b. [t]hat it was in fact received as evidenced by the attached registry receipt or other evidence satisfactory to the court of delivery to the addressee; and c. [t]hat the genuine receipt or other evidence of delivery is attached.

N.C. Gen. Stat. § 1-75.10(a)(4) (2007).

{49}   C-S Aviation argues that the certified mail receipt TradeWinds placed in this Court's electronic record fails to indicate that its agent ever received the summons and Third-Party Complaint because no signature or date of receipt is noted on the return receipt.  (*See* Br. Supp. Mot. Set Aside 17.)  C-S Aviation acknowledges that TradeWinds filed the original certified mail receipt, "which bears a stamped signature and date, in Guilford County Superior Court as an attachment

to the 25 March Affidavit of Service." (Br. Supp. Mot. Set Aside 17.) It argues that the signed receipt in the Guilford County Superior Court file was never presented to this Court; therefore, the proof fails to meet the standard set forth in section 1-75.10(a)(4) of the North Carolina General Statutes. (Br. Supp. Mot. Set Aside 17.) In response, TradeWinds stresses that the return receipt found in this Court's electronic file is a "lesser quality copy" of the original return receipt filed in the Guilford County Superior Court. (Br. Resp. Mot. Set Aside 16–17.)

{50} There is no dispute that TradeWinds' original return receipt demonstrates that the CT Corporation received the summons and Third-Party Complaint. This receipt was received by the Clerk of Court and made part of the official court file in Guilford County. Local rules indicate this Court's preference for the electronic filing of all documents. *See* BCR 6.1 (2006). The rules, however, do not require that any information in the Business Court be filed by electronic means. *See id.* Additionally, all documents submitted to the Business Court must also "be filed . . . with the Clerk of Superior Court in the judicial district in which the matter is pending." BCR 8.1 (2006).

{51} It is a peculiar requirement of this Court that parties before it must submit dual sets of files during the course of a matter. TradeWinds provided this Court with an affidavit of service when it electronically filed the return receipt. That the inferior copy did not show a signature does not destroy TradeWinds' proof of service, as the proof is contained in the official Guilford County file. The statute used by C-S Aviation to challenge the proof of service allows the Court the discretion to use "the attached registry receipt *or other evidence satisfactory to the court of delivery to the addressee*." N.C. Gen. Stat. § 1-75.10(a)(4)b (2007) (emphasis added). The original receipt properly placed in the Guilford County file provides sufficient evidence for this Court to determine that the summons and Third-Party Complaint were delivered.

c.

## THE CONRY AFFIDAVIT AVERS FACTS TO ESTABLISH PERSONAL JURISDICTION

{52}    The Court finds that Jeff Conry's affidavit avers sufficient facts to establish grounds for personal jurisdiction over C-S Aviation. In a judgment where a personal claim is made against a defendant who fails to appear, "the court shall require proof by affidavit or other evidence . . . of the existence of any fact not shown by verified complaint which is needed to establish grounds for personal jurisdiction over the defendant." N.C. Gen. Stat. § 1-75.11(1) (2007). Because TradeWinds' Third-Party Complaint against C-S Aviation was not verified, TradeWinds must rely on Mr. Conry's affidavit to assert personal jurisdiction. (*See* Br. Supp. Mot. Set Aside 19–20.)

{53}    Resolving the question of personal jurisdiction "involves a two-fold determination: (1) do the statutes of North Carolina permit the courts of the jurisdiction to entertain this action against the defendant, and (2) does the exercise of this power by the North Carolina courts violate the due process of law." *Green Thumb Indus. of Monroe, Inc. v. Warren County Nursery, Inc.*, 46 N.C. App. 235, 239–40, 264 S.E.2d 753, 755 (1980). "In determining whether the 'long-arm' statute permits our courts to entertain an action against a particular defendant, the statute should be liberally construed in favor of finding jurisdiction." *Strother v. Strother*, 120 N.C. App. 393, 395, 462 S.E.2d 542, 543 (1995); *see also Century Data Sys., Inc. v. McDonald*, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 ("Our [long-arm] statute is designed to extend jurisdiction over nonresident defendants to the fullest limits permitted by the Fourteenth Amendment's due process clause. We thus give a broad and liberal construction to the provisions of the statute, within the perimeters established by federal due process."); *Barclays Leasing, Inc. v. Nat'l Bus. Sys., Inc.*, 750 F. Supp. 184, 187 n.1 (W.D.N.C. 1990) (concluding the "North Carolina long-arm statute extends to the outer bounds of due process, making the analysis under the statute and the due process clause one and the same," yet considering both statutory and due process prongs in its analysis of the issue).

{54}   The North Carolina "long-arm" statute defines a number of circumstances under which personal jurisdiction over a defendant is proper.  *See* N.C. Gen. Stat. § 1-75.4.  With respect to local injury by a foreign act, a North Carolina court may assert personal jurisdiction

> in any action claiming injury to . . . property within this State arising out of an act . . . outside this State by the defendant, provided in addition that at or about the time of the injury either: a. [s]olicitation or services activities were carried on within this State by or on behalf of the defendant; [or] b. [p]roducts, materials or thing processed [or] serviced . . . by the defendant were used . . . within this State in the ordinary course of trade . . . .

N.C. Gen. Stat. § 1-75.4(4)(a), (b) (2007).

{55}   In order to establish personal jurisdiction under this circumstance, a plaintiff first must claim that it suffered an injury in the state that arose by defendant's acts outside the state.  *See Barclays Leasing*, 750 F. Supp. at 188.  The statute is satisfied "if the plaintiff merely *claims* an injury occurred, not that the plaintiff has actually proven the injury."  *Id.*; *see also Munchak Corp. v. Riko Enter., Inc.*, 368 F. Supp. 1366, 1371 (M.D.N.C. 1973) (finding that a claim of financial losses due to the defendant's tortious conduct was sufficient to meet the requirements of section 1-75.4(4)).  There is no dispute that Mr. Conry's affidavit alleges injury.  Mr. Conry describes in detail the particular damages TradeWinds suffered from C-S Aviation's alleged misrepresentations.  (*See* Conry Aff. ¶¶ 18–24.) Therefore, the Court concludes that the affidavit satisfies the statutory requirement for a claim of injury.

{56}   Second, a plaintiff must claim that the defendant either solicited or carried on service activities within the state.  In *TEC Graphics, Inc. v. International Screen Printing Equipment, Inc.*, the federal district court for the Eastern District of North Carolina considered this section of the North Carolina long-arm statute.  *See* No. 5:95-CIV-286-BR(2), 1995 U.S. Dist. LEXIS 14925, at *2–6 (E.D.N.C. 1995). Though the corporate defendant maintained no physical presence in the state and though its agents never appeared in the state "to negotiate or enter into any

contract or to perform any services" on behalf of the company, the court found that the long-arm statute permitted a finding of personal jurisdiction over them. *Id.* at *1. The plaintiff in the case made the initial contact based on the defendant's advertisement in a trade publication. *See id.* at *2. The defendant negotiated and entered into a contract with the plaintiff for the sale of a printing press to a third party and subsequent lease of the printing press by the plaintiff. *See id.* Because the defendant advertised in a publication that reached the forum and negotiated with the plaintiff about the terms of the lease, the solicitation requirement of the statute was satisfied. *See id.* at *3–5 (*citing Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1065–68 (4th Cir. 1982).

{57}　C-S Aviation contends that the Conry affidavit does not state that it was engaging in solicitation in North Carolina. (Reply Br. 12.) The affidavit, however, must merely allege facts from which the Court may infer the grounds for personal jurisdiction. *See Blankenship v. Town & Country Ford, Inc.*, 155 N.C. App. 161, 167, 574 S.E.2d 132, 136 (2002). C-S Aviation might argue that its conduct cannot constitute solicitation because TradeWinds, rather than C-S Aviation, initiated the contact between the parties. This argument, however, also provides no assistance.

{58}　First, Mr. Conry's affidavit notes that at the time TradeWinds was searching for an aircraft vendor, C-S Aviation was the "world's largest lessor of A300 aircraft and held itself out as being experienced with evaluating, maintaining, and leasing such aircraft." (Conry Aff. ¶ 8.) In the printing business, advertisements may well be a necessity. *See generally TEC Graphics, Inc.*, No. 5:95-CIV-286-BR(2). But when a company is known in the air freight community as the world's largest lessor of a particular type of aircraft, publication in trade magazines may not be required to sustain a customer base. The fact that TradeWinds initially approached C-S Aviation because of its reputation in the air transportation industry rather than reading about the company in a paid advertisement is not dispositive of the issue. *See, e.g., Blue Mako, Inc. v. Mindis*, 472 F. Supp. 2d 690, 701 (M.D.N.C. 2006) (containing a magistrate judge's recommendation, adopted by the district court, which denied a defendant's motion

to dismiss for lack of personal jurisdiction when it "actively entered into negotiations with the intent of establishing a franchise in North Carolina," even though the *plaintiff* initiated the contacts); *Barclays Leasing*, 750 F. Supp. at 188 (holding that defendant's contract negotiations on behalf of its co-defendant outside the state constituted a solicitation, without inquiry into which party initiated the contact).

{59}    Second, the broad definition of "solicitation" in the statute encompasses C-S Aviation's conduct. *See* N.C. Gen. Stat. § 1-75.2(5) (2007).  Within the relevant article of the statute, "'[s]olicitation' means a request or appeal *of any kind*, direct or indirect, by oral, written, visual, electronic, or other communication, whether or not the communication originates from outside the State." *Id.* (emphasis added).  The federal district court for the Western District of North Carolina applied this definition broadly in a dispute about leased embossing equipment. *See Barclays Leasing, Inc.*, 750 F. Supp. 187–88.  The court found that Defendant NBS Canada solicited the North Carolina plaintiff when it "conducted all negotiations on behalf of [co-Defendant and subsidiary] NBS Delaware in relation to the lease agreement." *Id.* at 188.  NBS Canada had numerous telephone conversations and sent several letters to the plaintiff regarding the lease agreement. *See id.*  NBS Canada also acted as a guarantor of NBS Delaware's obligation, which provided evidence of both solicitation and service activities. *See id.*  Though NBS Canada was not a party to the lease agreement, the court noted that "[a] parent corporation cannot hide behind the fiction of a subsidiary and enjoy the benefits of a forum while at the same time avoiding the responsibilities attendant therewith." *Id.* at 189 (internal quotations omitted).

{60}    Here, the Conry affidavit alleges that C-S Aviation negotiated the lease agreements that controlled the obligations of TradeWinds and Wells Fargo, a trustee who became a party to the agreement to "comply with certain Federal Aviation Administration requirements." (Conry Aff. ¶¶ 8–10.)  Further, the affidavit alleges that C-S Aviation made certain assurances of aircraft engine performance to induce TradeWinds to lease the aircraft. (Conry Aff. ¶ 9.)  Though

Wells Fargo executed the lease agreement, the affidavit characterizes "the Initial Leases" as an agreement between TradeWinds and C-S Aviation. (Conry Aff. ¶ 10.) In addition, the affidavit states that C-S Aviation renegotiated the lease agreement with TradeWinds, which resulted in a reduction of the monthly lease payments. (Conry Aff. ¶¶12–13.) Finally, the Conry affidavit alleges that C-S Aviation delivered the aircraft with the nonconforming engine parts to TradeWinds. (*See* Conry Aff. ¶ 18.)

{61} The Conry affidavit alleges facts that place C-S Aviation in a similar position to that of NBS Canada in *Barclays Leasing, Inc.* C-S Aviation's alleged initial negotiations, inducements, and revisions to the TradeWinds' agreement are facts from which their solicitation of TradeWinds may be inferred. The affidavit alleges that though C-S Aviation did not execute the contract, it was the arbiter of the bargain, and it benefited from the leases. (*See* Conry Aff. ¶¶8, 9, 12.) Thus, it cannot take advantage of the laws of the forum and hide behind its trustee, Wells Fargo.

{62} Furthermore, the facts in the Conry affidavit support the view that C-S Aviation provided services for TradeWinds. C-S Aviation negotiated a lease agreement and a modification to that agreement, and the aircraft it provided to TradeWinds were to be used in North Carolina. (*See* Conry Aff. ¶¶ 3, 8–10, 12, 13.)

{63} Next, the Court must consider whether C-S Aviation's conduct, as alleged in the Conry affidavit, satisfies the requirements of due process. Due process requires that the defendant have "certain minimum contacts with our state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Tutterrow v. Leach*, 107 N.C. App. 703, 707, 421 S.E.2d 816, 819 (1992) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945) (internal quotation marks omitted). When a party asserts claims that arise out of the defendant's contacts with the state, a court will exercise "specific jurisdiction." *Carson v. Brodin*, 160 N.C. App. 366, 372, 585 S.E.2d 491, 496 (2003). "To establish specific jurisdiction, the court looks at the relationship among the parties, the cause of action, and the forum state to see if minimum contacts are

established." *Id.* (internal quotations omitted). The type and nature of contacts that establish personal jurisdiction are dependent upon the individual facts in each case. *See id.* The test is "ultimately a fairness determination: the defendant's conduct and connection with the forum state must be such that it reasonably anticipates being haled into court there." *Brickman v. Codella*, 83 N.C. App. 377, 383, 350 S.E.2d 164, 168 (1986) (internal quotations omitted). Additionally, "due process requires that [parties] have 'fair warning that a particular activity may subject'" them to the jurisdiction of a forum. *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182 (1985)). The warning "requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* at 384, 350 S.E.2d at 168 (internal quotations omitted).

{64}  TradeWinds asserts that the facts contained in Mr. Conry's affidavit establish a basis for specific jurisdiction because they show that C-S Aviation directed its actions towards TradeWinds' North Carolina business. (Br. Resp. Mot. Set Aside 21.) "C-S [Aviation] solicited, made assurances about, prepared, and was deeply involved in the Leases of Aircraft which were operated in North Carolina." (Br. Resp. Mot. Set Aside 21 (*citing* Conry Aff. ¶¶ 4, 8–23).)

{65}  C-S Aviation argues TradeWinds' list of facts contained in Mr. Conry's affidavit is not enough to establish personal jurisdiction. (Reply Br. 9.) Relying on *Tutterrow*, 107 N.C. App. at 703, 421 S.E.2d at 819, C-S Aviation claims that merely entering into a contract with a resident of the forum does not provide sufficient minimum contacts with that forum, unless the contract has a "substantial connection" with the state. (Reply Br. 10.)

{66}  In *Turrerrow*, the trial court found that the defendant never solicited any business in North Carolina and only entered into a business relationship with the plaintiff because of an ongoing relationship with a mutual acquaintance. *See* 107 N.C. App. at 709, 421 S.E.2d at 820. Additionally, the defendant's contacts with the plaintiff consisted of mere telephone conversations and a "handful of letters." *Id.*

More importantly, the record indicated that the performance of the contract would take place in Abu Dhabi, rather than in North Carolina. *See id.*

{67} For specific jurisdiction to exists, "it is not required that defendant be physically present within the forum, provided its efforts are purposefully directed toward forum residents." *Havey v. Valentine*, 172 N.C. App. 812, 816, 616 S.E.2d 642, 647 (2005). "A single contract can provide the basis for the exercise of jurisdiction over a non-resident defendant." *Telerent Leasing Corp. v. Equity Assocs., Inc.*, 36 N.C. App. 713, 719, 245 S.E.2d 229, 233 (1978) (*citing McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Because the contacts alleged in the current case have a "substantial connection" with North Carolina, *Tutterrow* is distinguishable. *Id.* at 720, 245 S.E.2d at 233.

{68} Here, as previously noted, Mr. Conry alleges that C-S Aviation negotiated a contract for the leasing of aircraft, made assurances about the aircraft engine performance, induced TradeWinds to enter into the contract, maintained an ongoing relationship with TradeWinds, renegotiated the agreement that resulted in better leasing terms for TradeWinds, and delivered the aircraft to TradeWinds in North Carolina. (Conry Aff. ¶¶ 8–10, 12, 13, 18.) The Conry affidavit alleges that C-S Aviation directed its efforts toward TradeWinds, who, while operating out of a North Carolina airport, was a North Carolina resident. (*See* Conry Aff. ¶¶ 8–13.) The alleged facts, therefore, demonstrate that C-S Aviation had sufficient minimum contacts with North Carolina so that the assertion of personal jurisdiction is not a violation of due process.

2.

MOTION TO SET ASIDE DEFAULT JUDGMENT

{69} This Court recognizes the stay of litigation ordered in the Florida bankruptcy proceeding in which TradeWinds is currently engaged. The Court notes, however, its concerns with the Default Judgment as it stands. "It is well settled that an entry of default is to be distinguished from a judgment by default." *Miller v. Miller*, 24 N.C. App. 319, 320, 210 S.E.2d 438, 438 (1974). Though an entry of default has been characterized as a "ministerial duty" that allows a trial

judge to apply a less strict "good cause" standard to set it aside, the North Carolina Court of Appeals recently set aside a portion of a default judgment while leaving an entry of default untouched. *Whaley v. Rhodes*, 10 N.C. App. 109, 111, 177 S.E.2d 735, 737 (1970) (*citing* 2 McIntosh, N.C. Practice 2d § 1668 (Supp. 1970)); *see Sharyn's Jewelers, LLC v. Ipayment, Inc.,* No. COA08-651, 2009 N.C. App. LEXIS 362, at *14 (Apr. 7, 2009).

{70} Under the Rules of North Carolina civil procedure, a court "may relieve a party . . . from a final judgment, order, or proceeding for . . . [a]ny . . . reason justifying relief from the operation of the judgment." N.C. R. Civ. P. 60(b)(6). "Rule 60(b) has been described as a grand reservoir of equitable power to do justice in a particular case." *Sloan v. Sloan*, 151 N.C. App. 399, 404, 566 S.E.2d 97, 101 (2002) (internal quotations omitted). "In order for a defendant to succeed in setting aside a default judgment under Rule 60(b)(6), he must show: (1) extraordinary circumstances exist, (2) justice demands the setting aside of the judgment, and (3) the defendant has a meritorious defense." *Gibby v. Lindsey*, 149 N.C. App. 470, 474, 560 S.E.2d 589, 592 (2002).

{71} The Court recognizes, without holding, that extraordinary circumstances <u>may</u> exist in this case. First, the default judgment stands at $54,867,872.49. A court may consider a large damage award to be an extraordinary circumstance in favor of setting aside a default judgment. *See Anderson Trucking Serv., Inc. v. Key Way Transp., Inc.*, 94 N.C. App. 36, 43, 379 S.E.2d 665, 669 (1989) (noting that extraordinary circumstances may exist to grant relief from judgment, "particularly in light of the large judgment awarded"). Second, there are significant procedural irregularities with respect to the Entry of Default and the Default Judgment in this case. This Court ordered a Default Judgment three (3) years and ten (10) months after the original Entry of Default. In addition, TradeWinds seeks to recover damages from a party who did not participate in the hearing for the Default Judgment. The North Carolina Court of Appeals has held that procedural irregularities can be an extraordinary circumstance. *See Taylor v. Triangle Porsche-Audi, Inc.*, 27 N.C. App. 711, 716–18, 220 S.E.2d 806, 810–11 (1975).

{72}    The Court also has concerns about fashioning an equitable solution for all parties involved in the dispute.  Particularly troubling is the fact that the Entry of Default was entered on behalf of the TradeWinds Group (TradeWinds, Coreolis, and Holdings), yet only TradeWinds participated in the Motion for the Default Judgment.  The disparity of interests for the parties suggests a new hearing on damages is in order, as C-S Aviation may have meritorious defenses to the damages awarded in the Default Judgment.

{73}    Judge Cristol has ruled that Coreolis and Holdings must litigate any issues concerning their respective rights to the North Carolina Default Judgment in the bankruptcy proceeding.  He did not foreclose Coreolis and Holdings from filing their own motion for default judgment, which they have done.  This Court will have difficulty determining those claims when a large default judgment covering broad damages has been entered solely in favor of TradeWinds.  A full hearing on damages with all affected parties represented and participating would provide a more just resolution than the procedural gamesmanship now being employed.  As the Court indicated above, it is concerned about the lack of transparency on the part of TradeWinds, particularly its failure to disclose the divergence of interests between TradeWinds and the other parties to the Entry of Default.  The effort to pierce the corporate veil and the filing of bankruptcy in an apparent effort to shield its Default Judgment from attack raise fundamental fairness issues that will need to be addressed when this Court proceeds after the stay is lifted by the Bankruptcy Court.  Only after this Court has determined whether the Default Judgment should be set aside and new hearings on damages conducted with participation of all claimants can the New York case proceed.

{74}    In summary, the likely course for the North Carolina case once the bankruptcy stay is lifted will be to decide C-S Aviation's Motion to Set Aside the Entry of Default and Default Judgment together with Coreolis and Holdings' Motion for Default Judgment.  If necessary, the Court may also hold a hearing on damages for any default judgments.  Counsel for C-S Aviation **SHALL** insure that

Judge Keenan receives a copy of this Order & Opinion, and counsel for TradeWinds **SHALL** insure that Judge Cristol receives a copy of this Order & Opinion.

{75}   All motions in this case are stayed pending the lifting of the stay order by Judge Cristol.

**IT IS SO ORDERED**, this the 29th day of April, 2009.